IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

JONATHAN IRWIN, )
)
       Plaintiff, )
)
v. ) No. 3:07-CV-218
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
       Defendant. )

## MEMORANDUM OPINION

This is an action for judicial review of defendant Commissioner's final decision denying plaintiff's claim for disability insurance and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 15] will be granted, and plaintiff's motion for summary judgment [doc. 13] will be denied.

I.

*Procedural History*

Plaintiff was born in 1971. He applied for benefits in May 2004, claiming to be disabled by a learning disability, obesity, high blood pressure, and "leg and back problems." [Tr. 62, 74, 210]. Plaintiff initially alleged a disability onset date of December

1, 2002 [Tr. 62, 210], which he later amended to September 23, 2003. [Tr. 320-22].[1] The present applications were denied initially and on reconsideration. Plaintiff then requested a hearing, which took place before ALJ Deborah Smith ("the ALJ") in January 2007.

In February 2007, the ALJ issued a decision denying benefits. Therein, she concluded that plaintiff suffers from organic mental disorders, borderline intellectual functioning, a personality disorder, obesity, and mild degenerative changes of the lumbar spine, which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 13]. Of particular relevance to the present appeal, the ALJ concluded that plaintiff does not satisfy the Commissioner's mental retardation listing, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C, because "the evidence shows that he fails to meet the adaptive functioning criteria prior to his 22nd birthday" in light of "questionable" motivation, "negative" credibility, "poor" school attendance, prior adaptive functioning, and a history of drug and alcohol abuse. [Tr. 13-16].

The ALJ found plaintiff to have a residual functional capacity ("RFC") for a restricted range of medium to light exertion. [Tr. 16-17]. Relying on vocational expert testimony, the ALJ concluded that plaintiff remains able to perform past relevant work. [Tr.

---

[1] Plaintiff previously applied for benefits in December 2000. [Tr. 34, 36]. By decision dated September 22, 2003, Administrative Law Judge ("ALJ") Ivar Avots denied the applications. ALJ Avots ruled that although plaintiff suffered from the "severe" impairment of "organic mental disorders" he remained able to perform his past relevant work. [Tr. 28, 33]. Plaintiff sought review from the Commissioner's Appeals Council and then from the United States District Court for the Eastern District of Kentucky. On December 15, 2004, United States District Judge G. Wix Unthank affirmed ALJ Avots's decision. The amended onset date in the present case corresponds to the issuance of ALJ Avots's ruling. [Tr. 320-22].

2

17]. In the alternative, again relying on vocational expert testimony, plaintiff was found capable of performing certain sedentary jobs existing in the regional and national economies. [Tr. 17]. Accordingly, he was again deemed ineligible for benefits.

Plaintiff then again sought, and was again denied, Appeals Council review. [Tr. 4]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Background*

Although he told Dr. Rodney Vivian in July 2006 that he has "never" worked, plaintiff's earnings record shows a significant work history. [Tr. 65-71, 239]. Plaintiff has been employed as a general laborer, sorter, mattress pad flipper, dishwasher, assembly line worker, lumberyard worker, grinder, and parts washer. [Tr. 65-71, 75-76, 93-99]. For the most part, he does not report a history of being fired from jobs. Rather, it is apparently the norm for plaintiff to quit his jobs when, for example, he becomes "embarassed [sic] when [his] employer finds out [he] can't read and [he] quit[s] and find[s] a new job," when he encounters "transportation problems," when he does "not make much money," when he is called upon to do "paperwork or something," when he finds himself unable to get out of bed in time for a work shift that begins at 4:00 p.m., when he wishes to "try to get a better more paying job," when he is allegedly in pain, when he moves, or when "it come[s] up to the hard

3

point." [Tr. 32, 75, 161, 326-27, 329-30, 332-33].[2]

Plaintiff began smoking marijuana when he was in third-grade, and he began drinking alcohol at approximately the same age. [Tr. 227, 256]. In his teens and twenties, plaintiff also "huffed" and used cocaine and LSD. [Tr. 227].

In April 2006, plaintiff told University Hospital staff that he does not use drugs at all. [Tr. 148]. In August 2006, plaintiff told a counselor that he had not smoked marijuana in the past year. [Tr. 222A]. Between these two dates, plaintiff tested positive for marijuana. [Tr. 310].

At the administrative hearing, plaintiff told the ALJ that he had not smoked marijuana *since* July 2006, but that he was smoking it *daily* prior to July 2006 "for pain medicine." [Tr. 338-39]. Purportedly without income for several years, plaintiff testified that his friends would give him marijuana daily because "it follows around them." [Tr. 339].[3]

Plaintiff claims to occasionally hear voices telling him "to slap somebody in the head," "to sock his cousin in the face," or to hurt himself. [Tr. 162, 291, 341-42]. He has elsewhere denied hallucinations. [Tr. 204, 239]. It is unclear from the record whether the

---

[2] At the administrative hearing, plaintiff denied under oath having ever been fired. [Tr. 326-27]. In a striking about-face, plaintiff told psychologist John Heideman that he "has been fired from more jobs than he could count on the fingers of both hands." [Tr. 161].

[3] The ALJ aptly described plaintiff's testimony as "evasive and vague" on this point. [Tr. 15].

4

purported hallucinations are secondary to drug and alcohol abuse.[4]

Plaintiff is 5' 5" tall and weighs as much as 400 pounds. [Tr. 206]. He was once described as "malignantly obese." [Tr. 222-22A].

In August 2004, plaintiff told the Commissioner (through his friend Sherry Sexson) [Tr. 101, 108] that he just sits around the house [Tr. 102], can perform no household chores due to pain, shortness of breath, and overheating [Tr. 104], does "not go anywhere" [Tr. 105], visits with others only twice per month [Tr. 105], and has "no social life . . . because of my illness." [Tr. 105]. Elsewhere, he has acknowledged being able to cook, vacuum, wash clothes, take out the trash, perform yardwork, attend church three times per week, and smoke marijuana with his friends daily. [Tr. 163, 167, 207, 323, 339, 342-43].

Plaintiff enjoys golfing. In August 2004, he told the Commissioner that he is no longer able to golf due to his illnesses. [Tr. 102]. The following month, he told a consulting psychologist that he "enjoys playing golf *but did not have the money to play any this past summer.*" [Tr. 162] (emphasis added). In July and August 2006, plaintiff reported that he golfs and "toss[es] ball." [Tr. 224, 284].

Plaintiff purports to have breathing difficulties so severe as to preclude employment, but he smokes between a half and one pack of cigarettes per day and - as noted - has historically smoked marijuana daily. [Tr. 109, 161, 204-05, 322]. Plaintiff purports to have diabetes and high blood pressure which are untreated. [Tr. 113, 120]. In July 2006, he

---

[4] Plaintiff testified that he "thinks" he has, or had, a drug or alcohol problem, but now "my God upstairs helps me out." [Tr. 340].

5

reported that his pain was no more than three on a scale of one to ten. [Tr. 275]. He remains able to carry logs for bonfires. [Tr. 335-36]. Plaintiff testified that he could do sedentary work if he had transportation and "a lot of breaks." [Tr. 334].

III.

*Relevant Evidence*

A. Education

As noted above, plaintiff was smoking marijuana and drinking alcohol by age ten, and as a teenager he "huffed" and used cocaine and LSD. [Tr. 227, 256]. Plaintiff describes his school attendance as poor. [Tr. 205]. When present in the classroom, he would admittedly "goof around" and sleep. [Tr. 159].

It is thus unsurprising that plaintiff found himself "in a slow learning class" or "classes for learning disabled children" by age eleven or twelve. [Tr. 78-79]. It appears that plaintiff took some special education classes as early as first or second grade. [Tr. 128]. In fifth grade, he scored IQs of between 60 and 81. [Tr. 137, 142]. Functioning was at times graded as "satisfactory" or "outstanding" in all areas evaluated. [Tr. 136]. Elsewhere, social functioning was described as "delayed," and "concerns were noted with limited acquired knowledge and school learning." [Tr. 142-43]. In ninth grade, plaintiff's IQ tested at 57 and he remained in special education classes. [Tr. 144-45].

Plaintiff purports to now have virtually no skills in reading, writing, or arithmetic. [Tr. 105, 120]. In sum, he states that "I'm illiterate and don't know anything."

6

[Tr. 290].

## B. Physical

Dr. Ali Arani performed a consultative examination in September 2004. Plaintiff complained of shortness of breath, but his lungs were found to be clear. [Tr. 150-51]. There was some edema of the lower extremities. [Tr. 151]. Gait was normal, there was no indication of joint arthritis, and there was no difficulty getting on and off of the examining table. [Tr. 151]. Range of motion was full throughout, with the exception of the lumbar spine which was mildly reduced with "mild . . . degenerative changes." [Tr. 151, 153, 156]. Dr. Arani described plaintiff as "oriented, able to maintain attention, concentrate, answer questions properly and handle his own benefits if granted." [Tr. 152]. Dr. Arani further wrote that "the degree of the obesity is contributing to the patient's mechanical restrictions. He claims that he cannot walk more than one-third of a mile, climb more than one flight of stairs or lift any objects heavier than thirty-to-forty pounds due to his back pain." [Tr. 152].

In July 2006, plaintiff exhibited full muscle strength in all extremities, and there was no edema of the ankles. [Tr. 252]. Dr. Vivian wrote, "He can resume normal activities and diet. He is not disabled." [Tr. 239]. Dr. Vivian's physical examination was "[u]nremarkable except for obesity." [Tr. 239].

## C. Mental

Psychologist John Heideman performed a consultative evaluation in September 2004. Regarding substance abuse, Dr. Heideman recorded plaintiff's report that

7

> [h]e has been up to drinking a twelve pack of beer in a day. In his teens, he could drink a fifth of Jack Daniels whiskey and a case of Budweiser in a day.
>
> Drinking has never really caused him problems . . . .
>
> . . .
>
> *He has no history with street drugs*.

[Tr. 161] (emphasis added). Plaintiff was noted to have "moderated" his drinking over the recent Labor Day weekend, having purportedly consumed only five or six beers. [Tr. 160]. Plaintiff was noted to be sunburned, as he had "spent the Labor Day weekend in a friend's above-ground pool." [Tr. 163]. Testing indicated a full scale IQ of 67. [Tr. 164]. Dr. Heideman diagnosed depression, adjustment disorder, alcohol dependence in sustained partial remission (by plaintiff's self-report), and "caffeine-induced sleep and anxiety disorders." [Tr. 165-66]. Dr. Heideman anticipated marked limitations in understanding, remembering, and following instructions. [Tr. 167]. Attention, concentration, persistence, and pace were thought to be moderately limited, and the ability to relate to others was not impaired. [Tr. 167]. Dr. Heideman concluded, "The claimant is not considered to be reliable or retainable for most jobs at this time because of his IQ of 67." [Tr. 168].

Nonexamining psychiatrist Patricia Semmelman completed a Mental RFC Assessment in September 2004. She opined that ALJ Avots's Mental RFC findings (permitting work) remained valid. [Tr. 184].

Nonexamining consultant Nancy McCarthy completed a Mental RFC Assessment in November 2004. Dr. McCarthy predicted no limitations of more than a

moderate degree. [Tr. 199-200].

Psychologist Dale Seifert performed a consultative evaluation in December 2004. Plaintiff "reported that he has never had an alcohol or drug abuse problem." [Tr. 204-05, 207]. Testing indicated math and reading skills at the first grade level. [Tr. 206]. Dr. Seifert predicted no more than moderate vocational limitations. [Tr. 208].

Plaintiff was admitted to Mercy Hospital in July 2006 secondary to complaints of chest pain and suicidal ideation. [Tr. 252]. Chest x-rays were normal. [Tr. 315]. Plaintiff related the crisis to an "emotionally abusive" brother who was currently providing housing for him and nine other family members. [Tr. 231, 239, 260, 281-82]. Plaintiff would become "very angry when his family expects him to do chores." [Tr. 239, 337-38].[5] Plaintiff denied any current drug use whatsoever, but tested positive for marijuana nonetheless. [Tr. 279, 287, 291]. At discharge, Dr. Vivian wrote,

> We do not see any acute treatable symptoms after two days. . . . He needs lots of redirection. We talked with his family who report that they are somewhat frustrated with his not wanting to help out at home, but these issues and concerns have been going on for many years. . . . We have no reason to hold him against his will and he is referred for outpatient treatment.

[Tr. 240].

Lastly, the record contains an Intake Form and an Adult Diagnostic Assessment from Clermont Counseling Center, dated August and September 2006. Plaintiff denied any

---

[5] At the administrative hearing, the ALJ asked plaintiff to elaborate on this episode. He answered, "Just yard work and, and around the house, like cleaning, sweeping and you do something, he'll tell you something and if it ain't done right he holler at you, like mental abuse." [Tr. 338].

9

current substance abuse other than an occasional "beer or two," and he claimed that he had not smoked marijuana in the prior year, despite testing positive the previous month. [Tr. 222A, 231]. The intake diagnosis was "schizoaffective disorder." [Tr. 232].

IV.

*Vocational Expert Testimony*

Janet Chapman ("Ms. Chapman" or "VE") testified as a vocational expert at the administrative hearing. The ALJ presented a number of hypothetical questions, all presuming a claimant who could not read or write. [Tr. 352]. The hypotheticals and Ms. Chapman's responses are summarized as follows:

> Q1: A hypothetical claimant who could understand, remember, and execute simple instructions, complete a work routine without excessive productivity demands, tolerate coworkers and changes in the workplace.
> A1: Could perform plaintiff's past relevant work.
>
> Q2: A claimant fitting Dr. Semmelman and ALJ Avots's mental RFC findings.
> A2: Could perform plaintiff's past relevant work.
>
> Q3: A claimant subject to Dr. Heideman's assessment.
> A3: The combination of marked and moderate impairments would preclude all employment.
>
> Q4: A claimant capable of medium exertion, with simple repetitive work, no production requirements, and no contact with the public.
> A4: Could perform plaintiff's past relevant work.
>
> Q5: A claimant capable of light exertion, with simple repetitive work, no production requirements, and no contact with the public.
> A5: Could perform plaintiff's past sorter and hand packager jobs.

Q6: A claimant limited to sedentary exertion, with simple repetitive work, no production requirements, and no contact with the public.
A6: Could perform inspector, tester, and monitoring jobs existing in the local and national economies.

Q7: A claimant with plaintiff's self-reported restrictions.
A7: All employment would be precluded by limitations of lifting and sitting.

[Tr. 348-53]. The ALJ relied on the responses to questions one, two, four, five, and six in finding plaintiff not disabled. [Tr. 16-18].

V.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

11

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A).[6] Disability is evaluated pursuant to a five-step analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

---

[6] A claimant is eligible for SSI on the basis of financial need and either age, blindness, or disability. 42 U.S.C. § 1382. "Disability," for SSI purposes, is defined the same as under § 423. 42 U.S.C. § 1382c(a)(3).

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof during the first four steps. *See Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id.*

VI.

*Analysis*

In the sole issue presented on appeal, it is contended that the ALJ erred in concluding that plaintiff does not satisfy one of the Commissioner's mental retardation listings, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. Listing 12.05C requires that a claimant demonstrate:

1. significantly subaverage general intellectual functioning with deficits in adaptive functioning, initially manifested before age 22; and

2. a valid verbal, performance, or full scale IQ of 60 to 70; and

3. a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. All of the above criteria must be satisfied. *See Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001). Plaintiff bears the burden of proof. *See Walters*, 127 F.3d at 529.

The court will assume, without deciding, that plaintiff has a physical or mental impairment that imposes an additional and significant work-related limitation of functioning.

13

He has, however, failed to meet his burden of proof as to § 12.05C's first prong, and satisfaction of the second prong is in considerable doubt.

As for the first prong, the ALJ recognized special education classes and sub-70 IQ scores prior to the age of 22 but concluded that "he fails to meet the adaptive functioning criteria prior to his 22nd birthday." [Tr. 13]. The ALJ cited plaintiff's admittedly "poor" school attendance, "which could have a large impact on the claimant's poor scores on intelligence testing." [Tr. 13]. The same holds true for the extraordinary substance abuse in plaintiff's early formative years, along with his tendencies to admittedly sleep and "goof around" when present in the classroom. It was far from unreasonable for the ALJ to consider that plaintiff's adaptive functioning may be as much or more a product of his behaviors than his genetics.

The ALJ further noted that plaintiff's cumulative adaptive functioning "is higher than that of a mentally retarded individual." [Tr. 13-16].[7] Also, the ALJ noted plaintiff's myriad misstatements regarding alcohol, drugs, and work history (issues obviously noted in detail in this court's opinion): "The claimant's inconsistent statements and allegations regarding the degree of functional impairment and the range of his activities diminish the credibility of his claim of disability." [Tr. 15].

---

[7] For example, in one year plaintiff earned more than $18,000.00 stacking mattress pads. [Tr. 330].

The ALJ's reasoning provides ample substantial evidence to support her conclusion regarding the first prong of listing 12.05C. Adjudicators should closely examine IQ scores "to assure consistency with daily activities and behavior." *Baker v. Comm'r of Soc. Sec.*, 21 F. App'x 313, 315 (6th Cir. 2001).

Regarding 12.05C's second prong, plaintiff cites the sub-70 IQ score from Dr. Heideman and further contends that the rulings of Judge Unthank and ALJ Avots are res judicata on this point. As for the IQ score, the ALJ's rationale cited immediately above applies equally to plaintiff's adult test results. *See id*. The court further notes that plaintiff blatantly mislead Dr. Heideman regarding his substance abuse. [Tr. 161]. Plaintiff's then-daily use of marijuana, along with his prior multi-decade use of LSD [Tr. 227], would have unquestionably impacted IQ testing.[8]

Regarding the preclusive effect of Judge Unthank's and ALJ Avots's opinions, plaintiff's argument is not well-taken. ALJ Avots merely stated that "[a]ccording to [a medical source], these scores fall within the Mild Mental Retardation range of intelligence" [Tr. 28] but went on to conclude that *no* prong of the relevant mental retardation listing had been met. [Tr. 30]. Similarly, Judge Unthank wrote only that sub-70 IQ scores "would appear to have been considered valid" by the testing source. Dicta taken out of context will not preclude a contrary (and more specific) decision by a subsequent adjudicator.

---

[8] "An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).

As for the ALJ's ultimate RFC conclusions, the court finds that she reasonably synthesized the available opinions of record. Plaintiff's purported mental limitations are weakened by the credibility issues rampant in the instant record, and his physical complaints are virtually unsupported. Although he purportedly has breathing problems, he continues to smoke. He allegedly suffers from diabetes and high blood pressure, but those conditions are undocumented. Chest x-rays were normal, the lumbar spine has only minimal degeneration, and physical examination was "[u]nremarkable except for obesity." Although he allegedly needs to smoke marijuana for pain relief, he admittedly rates the pain as no more than three on a scale of one to ten. While plaintiff's obesity may one day prove fatal, substantial evidence supports the conclusion that it does not presently render him disabled.

Lastly, to the extent that plaintiff seeks to rely on low Global Assessment of Functioning ("GAF") scores assigned by various consulting or interviewing sources, the court notes that those scores were based in part on plaintiff's unreliable self-reporting and are thus of minimal value. *See generally DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, (6th Cir. 2006). The final decision of the Commissioner was supported by substantial evidence and will be affirmed. An order consistent with this opinion will be entered.

ENTER:

                                      s/ Leon Jordan
                                  United States District Judge